2024 PA Super 173

| | | |
|---|---|---|
| IN RE: J.G. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.G. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 28 WDA 2023 |

Appeal from the Order Dated December 8, 2022
In the Court of Common Pleas of Allegheny County
Orphans' Court at No(s):  CC No. 492 of 2021

BEFORE:  DUBOW, J., MURRAY, J., and SULLIVAN, J.

OPINION BY SULLIVAN, J.: **FILED: August 8, 2024**

J.G. appeals from the order extending her involuntary commitment to inpatient mental health treatment pursuant to 50 P.S. § 7303 ("§ 303") of the Mental Health Procedures Act ("MHPA").  For the reasons discussed below, we reverse.

In November 2022, following a hearing, a hearing officer committed J.G. under section 303 to a period of involuntary commitment at Western Psychiatric Hospital-Oakland for a period not to exceed twenty days.  ***See*** Petition for Review, 12/5/22, at 2.  J.G. sought review of the hearing officer's decision before the Orphans' Court in December 2022.  ***See id***.  The Orphans' Court reviewed the tape of the prior hearing but did not hear additional evidence.  ***See*** N.T., 12/8/22, at 1-11.

The Orphans' Court summarized the testimony as follows:

> The testimony proffered in support of an extended involuntary commitment at the November . . . hearing included

that of Dr. [Katherine] Lyman, a resident physician at Western Psychiatric Institute [who testified on behalf of Appellee, Allegheny County ("the County")] assigned to the team treating [J.G.]. Dr. Lyman testified that J.G. had exhibited signs of bipolar disorder and, following admission, had shown some improvement. Notwithstanding that improvement, J.G. had "made comments expressing some passive death wish[,]" and consistently refused to take prescribed psychiatric medications. Accordingly, the determination was made that the least restrictive treatment option feasible for J.G. was to continue impatient treatment "so we'll know she'll be safe before she is discharged."

* * * * *

[J.G.] argued that some incidents . . . proffered as examples of erratic conduct and self-harm that had occurred before her admission to Western Psychiatric Hospital exaggerated, or misconstrued J.G.'s actual behavior. One such allegation was that J.G. had dragged a mattress and box spring from her house and burned them in her backyard, causing police[1] to be called to her yard. J.G. plausibly testified, however, that[] within her municipality[] backyard burning is permitted on specified days and that her offense was having been mistaken as to the proper date.

J.G. concedes that she has not cooperated with the prescribed regimen of medications while at Western Psychiatric. She explains, however, that, due to an impairment resulting from gastric bypass surgery, she is unwilling to conform fully to the medication regimen.

Orphans' Court Opinion, 3/1/23, at 3-5 (record citations and footnotes omitted; footnote added).

The Orphans' Court upheld the hearing officer's determination. **See** Order, 12/8/22, at 5. It found although J.G. has been otherwise a

---

[1] In fact, according to the testimony at the hearing, an unknown individual, not the police, called the fire department. **See** N.T., 11/29/22, at 9-10.

"cooperative patient," her refusal to take medications that "are essential to her well-being and necessary to prevent dangerous conduct and self-neglect" mandated her continued commitment. Orphans' Court Opinion, 3/1/23, at 5. The instant, timely appeal followed.[2]

On appeal, J.G. raises the following issue:

Was the evidence presented at [J.G.'s section 303] commitment hearing insufficient to establish that she was committable under either § 7301(b)(1) (danger to others)[3] or § 7301(b)(2)(i) (danger to self)?

J.G.'s Brief at 3 (footnote added).

When reviewing a court order for involuntary commitment, "we must determine whether there is evidence in the record to justify the court's findings. Although we must accept the trial court's findings of fact that have support in the record, we are not bound by its legal conclusions from those facts." *In re S.O.*, 311 A.3d 1132, 1135 (Pa. Super. 2024) (citation omitted).

The MHPA provides in pertinent part:

Whenever a person is severely mentally disabled and in need of immediate treatment, he may be made subject to involuntary emergency examination and treatment. A person is severely mentally disabled when, as a result of mental illness, his capacity to exercise self-control, judgment and discretion in the conduct of his affairs and social relations or to care for his own personal needs

_____

[2] J.G. and the Orphans' Court complied with Pa.R.A.P. 1925.

[3] This Court has not found any indication in the Orphans' Court's opinion that it committed J.G. pursuant to § 7301(b)(1). *See* Orphans' Court Opinion, 3/1/23, at 2-5. Accordingly, we will not address the question of whether the evidence was sufficient to commit J.G. pursuant to that subsection.

is so lessened that he poses a clear and present danger of harm to others or to himself, as defined in subsection (b)[.]

50 P.S. § 7301(a).

The MHPA states there is a clear and present danger to self if within the past thirty days:

(i) the person has acted in such manner as to evidence that he would be unable, without care, supervision and the continued assistance of others, to satisfy his need for nourishment, personal or medical care, shelter, or self-protection and safety, and that there is a reasonable probability that death, serious bodily injury or serious physical debilitation would ensue within 30 days unless adequate treatment were afforded under this act; or

(ii) the person has attempted suicide and . . . there is the reasonable probability of suicide unless adequate treatment is afforded under this act. For the purposes of this subsection, a clear and present danger may be demonstrated by the proof that the person has made threats to commit suicide and has committed acts which are in furtherance of the threat to commit suicide; or

(iii) the person has substantially mutilated himself or attempted to mutilate himself substantially and . . . there is the reasonable probability of mutilation unless adequate treatment is afforded under this act. For the purposes of this subsection, a clear and present danger shall be established by proof that the person has made threats to commit mutilation and has committed acts which are in furtherance of the threat to commit mutilation.

50 P.S. § 7301(b)(2)(i-iii). Further, the United States Supreme Court has stated:

[t]here is ... no constitutional basis for confining . . . persons involuntarily if they are dangerous to no one and can live safely in freedom . . .. That the State has a proper interest in providing care and assistance to the unfortunate goes without saying. But the *mere presence of mental illness* does not disqualify a person from preferring his home to the comforts of an institution.

*O'Connor v. Donaldson*, 422 U.S. 563, 575 (1975) (emphasis added).

The petition here sought extended mental health treatment pursuant to section 303. That provision provides "[a]pplication for extended involuntary emergency treatment may be made for any person who is being treated pursuant to [section] 302 whenever the facility determines that the need for emergency treatment is likely to extend beyond 120 hours." 50 P.S. § 7303(a) (footnote omitted). To support such a commitment, the county must present clear and convincing evidence of the need. *See In re Vencil*, 152 A.3d 235, 242 (Pa. 2017). Clear and convincing evidence is the "**highest standard of proof** utilized in civil proceedings, requiring evidence that is '**so clear, direct, weighty, and convincing** as to enable the [trier of fact] to come to a clear conviction, without hesitancy, of the truth of the precise facts [in] issue.'" *Id.* at 237 n. 1 (citation omitted, emphases added).

J.G. argues the evidence presented "did not suffice to establish [] grounds to commit her." J.G.'s Brief at 5. She contends the evidence did not show she was a danger to herself and others. *See id*. at 6-23.

The Orphans' Court's basis for continuing J.G.'s commitment is somewhat unclear because the court failed to specify whether a particular provision of the MHPA applied. *See* Orphans' Court Opinion, at 2-5. The certified record does not contain the original commitment petition, and neither party specifically identifies the precise statutory basis for the sought-for commitment. *See* J.G.'s Brief at 1-24; Appellee's Brie at 1-21. This Court

- 5 -

should not have to guess at such critical information. However, based upon the findings cited above, the Orphans' Court appears to have continued J.G.'s commitment pursuant to 50 P.S. § 7301(b)(2)(i).[4] **See** Orphans' Court Opinion, at 5.

Prior to discussing the merits of J.G.'s claim, we must first decide if this matter is properly before us. **Trust of Middleton**, 313 A.3d 1079, 1085 (Pa. Super., 2024). The County states J.G. is no longer committed. **See** County's Brief at 4.

Generally, this Court will not decide moot or abstract questions. **See Commonwealth v. Smith**, 486 A.2d 445, 447 (Pa. Super. 1984). A case is moot when a "determination is sought on a matter which, when rendered, cannot have any practical effect on the existing controversy." **In re T.J.**, 699 A.2d 1311, 1313 (Pa. Super. 1997), **rev'd on other grounds**, 739 A.2d 478 (Pa. 1999); **see also Middleton**, 313 A.3d at 1086-87. However, there are several exceptions to the mootness doctrine, one of which applies when an issue is repeatable and likely to elude appellate review. **Commonwealth ex rel. Kearney v. Rambler**, 32 A.3d 658, 663 (Pa. 2011); **see also Middleton** at 1086-87; **In re T.J.**, 739 A.2d at 481 n. 2 (stating the fact the decision will

---

[4] Notably, the hearing officer heard no evidence J.G. ever "inflicted or attempted to inflict serious bodily harm on another[,]" or "made threats of harm and has committed acts in furtherance of the threat to commit harm[.]" 50 P.S. § 7301(b)(1); **see also** N.T., 11/29/22, at 1-23. Further, the hearing officer heard no evidence J.G. was suicidal or had mutilated herself. **See** 50 P.S. § 7301(b)(2)(ii) and (iii); **see also** N.T., 11/29/22, at 1-23.

have no effect on the litigant is immaterial where the issue is "capable of repetition and yet apt to evade review").

Section 303 petition proceedings are subject to a rapid and informal procedure. The MHPA strikes a balance between "the state's valid interest in imposing and providing mental health treatment and the individual patient's rights," and provides procedures balancing those interests. *In re Hutchinson*, 454 A.2d 1008, 1010 (Pa. 1982). Evidence for a section 303 petition must be presented as part of an application by the county within 120 hours of the initial commitment. *See* 50 P.S. § 7303(a). The evidence is heard at an informal hearing by a judicial officer without a jury. *See* 50 P.S. § 7303(c). A decision must be made at the conclusion of the hearing whether the patient needs further involuntary treatment or order the hospital to discharge the patient. *Id*. Thus, legal questions may appear in a case involving a section 303 petition, which are likely to appear in future section 303 determinations but evade review because of the time-sensitive nature of section 303 petitions.

The question of what constitutes clear and convincing evidence that a patient is a danger to herself is both important to the public interest and yet likely to evade review. *See T.J.*, 739 A.2d at 481 n. 2. Thus, we will address J.G.'s issue. *See In re S.L.W.*, 698 A.2d 90, 92 (Pa. Super. 1997) (stating "[d]espite the fact that MHPA matters frequently appear moot due to the lapse

of time between an involuntary commitment and appellate disposition, our courts consistently have held that a live controversy exists in these cases.").

As noted above, the Orphans' Court did not specify which subsection of section 7301 it relied upon in continuing J.G.'s involuntary commitment. **See** Orphans' Court Opinion, 3/1/23, at 2-5. However, based upon the Orphans' Court's Opinion and our review of the evidence, the continued commitment could only have been pursuant to section 7301(b)(2)(i). We note the Orphans' Court failed to make specific credibility findings and clearly enumerate its basis for finding clear and convincing evidence J.G. "has acted in such manner as to evidence that [s]he would be unable, without care, supervision and the continued assistance of others, to satisfy [her] need for nourishment, personal or medical care, shelter, or self-protection and safety, and that there is a reasonable probability that death, serious bodily injury or serious physical debilitation." 50 P.S. § 7301(b)(2)(i); **see also** Orphans' Court Opinion, 3/1/23, at 2-5.

The standard to commit an individual under § 7301(b)(2)(i) is a stringent one. This Court has explained:

> [r]ecognizing the substantial curtailment of liberty inherent to an involuntary commitment, our Supreme Court has cautioned that the courts must strictly interpret and adhere to the statutory requirements for commitment. In interpreting section 301(b)(2)(i), this Court has held that . . . [w]ithout evidence that the individual would die or suffer serious bodily injury or serious physical debilitation in the immediate future unless [s]he was committed, the statutory requirement ha[s] not been met. Similarly, for involuntary commitment, it is not sufficient to find only that the person is in need of mental health services. The

- 8 -

court must also establish that there is a reasonable probability of death, serious injury or serious physical debilitation to order commitment.

*In re T.T.*, 875 A.2d 1123, 1126-27 (Pa. Super. 2005) (citations omitted).

Here, the Orphans' Court relied on Dr. Lyman's testimony, which it treated as expert testimony. *See* Trial Court Opinion, 3/1/23, at 3. Pennsylvania Rule of Evidence 705 requires "[i]f an expert states an opinion the expert must state the facts or data on which the opinion is based." Pa.R.E. 705. Moreover, our Court has stated:

the minimal threshold that expert testimony must meet to qualify as an expert opinion rather than merely an opinion expressed by an expert, is this: the proffered expert testimony **must point to, rely on or cite some scientific authority—whether facts, empirical studies, or the expert's own research**—that the expert has applied to the facts at hand[,] and which supports the expert's ultimate conclusion. **When an expert opinion fails to include such authority, the trial court has no choice but to conclude that the expert opinion reflects nothing more than mere personal belief.**

*Interest of La.-Ra. W.*, 266 A.3d 1071, 1084-85 (Pa. Super. 2021) (citation omitted, emphases in original).

Dr. Lyman's testimony more closely resembles "merely an opinion expressed by an expert" than an expert opinion. *Id*. In her brief testimony,[5] Dr. Lyman stated J.G. suffered from "unspecified bipolar disorder" which is a "severe mental illness." N.T., 11/29/22, at 11. Dr. Lyman acknowledged

_____

[5] Dr. Lyman's testimony occupies less than three pages of transcript. *See* N.T., 11/29/22, at 11-13.

that, while hospitalized, J.G. "has been fairly cooperative." *Id.* Dr. Lyman said, without providing details, when J.G. "first got here" she had some "rapid[,] pressured speech" and was "somewhat verbally aggressive." *Id*. Dr. Lyman also stated when J.G. first arrived she "made some comments . . . expressing some passive death wish." *Id*. at 11-12. Dr. Lyman explained J.G. was only sleeping four to five hours per night and refused psychiatric medication. *See id*. When asked why J.G. needed continued treatment, Dr. Lyman explained:

> We are seeing signs of bipolar disorder. We think she has improved since she got here. But we think, to be safe, we need to continue treating her, monitoring her, continuing to at least offer medications and partially medication and partially time in a safe environment . . . are going to help her to reach her baseline so we know she'll be safe before she is discharged.
>
> * * * * *
>
> We would like to see some improved insight judgment. We think if she we able to get to the point where she's cooperating and taking medications, that would be very helpful. We would also like to start to see her sleeping more. . . . [J.G. is] still at risk for making poor decisions.

*Id*. at 12-13. Dr. Lyman did not testify that J.G. was delusional or suffered from hallucinations. *See id*.

Beyond Dr. Lyman's testimony, the Court offered only J.G.'s father's testimony. *See id*. at 3-10. The Orphans' Court discussed only his testimony

about the mattress burning,[6] did not recount his testimony in its opinion, and did not make any findings concerning his credibility. **See** Orphans' Court Opinion, 3/1/23, at 2-5.

The evidence presented here does not meet the high clear and convincing evidence standard used in civil proceedings. Dr. Lyman failed to support her conclusory opinions with any specific facts that show clear and convincing facts that support self-harm or self-care issues. **See** N.T. 11/27/22, at 11-13. Dr. Lyman testified J.G. suffered from a mental illness, made poor decisions, lacked insight, was not getting sufficient sleep, and would be better served by taking psychiatric medication. **See id**. at 11-13. Dr. Lyman concluded it would be safer for J.G. to remain involuntarily committed for a longer period. **See id**. at 12. Even accepting all those assertions as true, they fail to show J.G. was such a danger to herself that she was at risk of death or serious injury. **See T.T.**, **supra**.[7]

Here, the record supports only the "mere presence of mental illness" as expressed in **O'Connor**, 422 U.S. at 575. Thus, we conclude, as a matter of

---

[6] In fact, the Orphans' Court found J.G.'s version of the event "plausibl[e.]" **See** Orphans' Court Opinion at 4. The Orphans' Court also credited J.G.'s testimony, **see** N.T., 11/29/22, at 13-20, she was refusing psychiatric medication because of physical problems. **See** Orphans' Court Opinion at 4-5.

[7] Additionally, this Court cannot discern what Dr. Lyman meant by a "passive death wish," a phrase left unexplained below. **Id**. at 12.

law, the evidence in the instant matter was insufficient to show J.G. was a danger to herself. *See In Interest of Green*, 417 A.2d 708, 710-11 (Pa. Super. 1980) (affirming trial court's denial of continued involuntary commitment pursuant to section 7301(b)(2)(i) where evidence showed patient had previously engaged in self-harming behavior but had improved during his treatment, and there was no testimony he was a "clear and present danger" to himself or others, but psychiatrist sought continued placement so that patient could continue to receive beneficial treatment). *Compare T.T.*, 875 A.2d at 1127-28 (holding evidence sufficient to sustain continued section 7302(b)(2) commitment where T.T.'s mental health issues so impacted his physical health that he could not walk, suffered from muscle atrophy, and was in danger of permanent disability); *In re S.B.*, 777 A.2d 454, 458-59 (Pa. Super. 2000) (holding evidence sufficient to sustain a further section 7301(b)(2) commitment where S.B. made direct threats of self-harm, required safety checks while hospitalized, and refused to sign a safety plan, eat, or take medication).

Because the evidence was insufficient to sustain the further commitment of J.G. pursuant to § 7301(b)(2)(i), we are constrained to reverse the trial court's commitment order.

Order reversed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

8/8/2024