J-A26026-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: M.C.K., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: M.C.K. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 450 WDA 2024 |

Appeal from the Dispositional Order Entered February 15, 2024
In the Court of Common Pleas of Warren County Criminal Division at
No(s):  CP-62-JV-0000094-2023

BEFORE:  BOWES, J., BECK, J., and BENDER, P.J.E.

MEMORANDUM BY BECK, J.:                **FILED: February 10, 2025**

M.C.K. appeals from the dispositional order entered by the Warren County Court of Common Pleas ("juvenile court") subjecting him to a five-year period of intensive probation and outpatient treatment.  We affirm.

E.S., who was then fourteen years old, began dating M.C.K., then thirteen, on July 5, 2022.  They started having sex around November of 2022.  At M.C.K.'s suggestion, the two later "tried … consensual non-consent," which E.S. described as "like pretend rape."  N.T., 11/21/2023, at 23.  The two created a safe word to be used if E.S. wanted M.C.K. to stop.  Initially, M.C.K. would stop when she used their safe word.  *Id.* at 28.  Eventually, M.C.K. asked her to try anal sex, which she consented to the first time.  *Id.* at 29.  However, she experienced pain and started crying, and M.C.K. stopped.  *Id.* at 30.  She told him that she did not want to have anal sex again, but M.C.K.

continued asking and they had anal sex "[s]omewhere between four and eight" more times. *Id.* at 31. E.S. testified that she did not consent to any instance after the first.

E.S. testified that, aside from the first time, the incidents all generally happened the same way. *Id.* at 40. M.C.K. would pull her pants and underwear down and begin inserting his penis into her anus. She would "ask[] him to stop and repeat[] the safe word" that the two established. *Id.* at 41-42. M.C.K. would not stop, tell her "to shut up," *id.* at 42, and call her "his sex doll[,] … a whore and a slut." *Id.* at 44. At first, E.S. would try to leave the bed, but M.C.K. would push her back down with his hands. *Id.* at 42. "[T]owards the end[,] [she] started just giving up" and did not try to resist. *Id.* at 43. She confirmed that she said the safe word on each occasion, and each time he ignored the word and would continue. *Id.* at 60. She did not tell anyone about the rapes until after they broke up on August 5, 2023, when E.S. caught him cheating. *Id.* at 49.

E.S. eventually disclosed the acts and sat for a forensic interview with the Children's Advocacy Center. The Commonwealth thereafter filed a petition alleging that M.C.K. was delinquent on November 3, 2023, citing thirty acts that would be crimes if committed by an adult. The Warren County Juvenile Probation Department ("Probation Department") placed M.C.K. in shelter care at the Keystone Adolescent Center that same day on their own initiative. The

juvenile court held a detention hearing on November 6, 2023, and continued the placement.

The juvenile court conducted an adjudication hearing on November 21, 2023, at which E.S. testified for the Commonwealth. The court determined that the Commonwealth met its burden of proof for twenty-eight of the counts[1] "based upon … four incidents of anal sexual assault by forcible compulsion." *Id.* at 241-42. Following postponements requested by both parties, the juvenile court held the dispositional hearing on February 15, 2024, at the conclusion of which M.C.K. was adjudicated delinquent. M.C.K. was placed on intensive probation for a period of five years, along with court-ordered outpatient sexual therapy. M.C.K. filed a notice of appeal and a concise statement as ordered, raising twenty-two points of error. M.C.K. now presents nine issues for our review:

> (1) Whether the removal of M.C.K. from his home and continued pre-adjudicatory placement in shelter care violated the Juvenile Act and/or M.C.K.'s rights to due process.
>
> (2) Whether the Commonwealth violated the Pennsylvania Rules of Juvenile Court Procedure and M.C.K.'s right to due process by withholding mandatory discovery materials from the defense.
>
> (3) Whether the [juvenile] court abused its discretion in ruling on evidentiary matters related to electronic communications.
>
> (4) Whether the [juvenile] court abused its discretion in citing the Rape Shield Law to disallow cross-examination of the purported victim regarding her past relationships.

---

[1] The Commonwealth conceded that the remaining two counts of strangulation should be dismissed.

(5) Whether the [juvenile] court erred and/or abused its discretion in its role as fact-finder by failing to weigh the credibility of the purported victim.

(6) Whether there was insufficient evidence to allow the [juvenile] court to find beyond a reasonable doubt that M.C.K. committed the alleged offenses, where the Commonwealth failed to prove beyond a reasonable doubt that M.C.K. committed any alleged act without the purported victim's consent.

(7) Whether the [juvenile] court erred and/or abused its discretion in failing to weigh and consider M.C.K.'s mistake of fact regarding the purported victim's consent.

(8) Whether there was insufficient evidence to allow the [juvenile] court to find beyond a reasonable doubt that M.C.K. committed any offense an element of which is forcible compulsion, where the Commonwealth failed to prove the element of forcible compulsion beyond a reasonable doubt.

(9) Whether the [juvenile] court abused its discretion in finding that M.C.K. committed the alleged offenses, where said findings were the result of manifest unreasonableness, partiality, and/or prejudice, as evidenced by the court's statements regarding work on behalf of juveniles and the credibility of purported victims.

M.C.K.'s Brief at 3-4.[2]

### **Pre-disposition detention**

M.C.K.'s first claim pertains to his detention beginning on November 3, 2023, the day the delinquency petition was filed. *Id.* at 9-14. A Probation Department officer signed an order committing M.C.K. to a shelter. The court held a hearing three days later and entered an order finding that probable cause existed for the offenses, and that it would be contrary to M.C.K.'s

---

[2] The argument section of M.C.K.'s brief is divided into eight parts. The ninth claim listed has been abandoned. In any event, it is duplicative of the fifth issue in its substance.

welfare to allow him to remain at his residence. Juvenile Court Order, 11/6/2023 at 1. The order acknowledged that services were not offered to prevent M.C.K.'s removal but determined that the nature of the offenses and need to protect E.S. constituted an emergency.[3] *Id.* The juvenile court held review hearings as to the continued need for M.C.K.'s detention throughout these proceedings until the disposition, concluding each time that M.C.K. should remain in shelter.[4] M.C.K. argues that the "[Probation Department] and/or the court" failed "to consider less-restrictive pre-adjudicatory alternatives than shelter care," and that these failures "violated both the express edicts of the Juvenile Act and M.C.K.'s right to due process." M.C.K.'s Brief at 13.

This issue is moot due to M.C.K.'s release. "The mootness doctrine requires that an actual case or controversy exist 'at all stages of review, not merely at the time the complaint is filed.'" *Int. of N.E.M.*, 311 A.3d 1088, 1094 (Pa. 2024). A case is moot if our decision "when rendered, cannot have any practical effect on the existing controversy." *In re J.G.*, 320 A.3d 1286, 1290 (Pa. Super. 2024) (citation omitted). Three exceptions apply: "1) the case involves a question of great public importance, 2) the question presented is capable of repetition and apt to elude appellate review, or 3) a party to the

___

[3] The juvenile court's opinion noted that E.S. and M.C.K. "attend[ed] the same school for half of each school day[.]" Juvenile Court Opinion, 5/8/2024, at 2.

[4] M.C.K. is now "residing with family members." Juvenile Court Opinion, 5/8/2024, at 11.

controversy will suffer some detriment due to the decision of the trial court." **Rivera v. Pennsylvania Dep't of Corr.**, 837 A.2d 525, 528 (Pa. Super. 2003) (citation omitted). M.C.K. alludes to the first exception to mootness, arguing that this issue is "impactful to the community" at large. M.C.K.'s Brief at 14.

We decline to apply an exception here, as M.C.K.'s arguments are all fact-specific and do not address the legal issues. Although he briefly raises due process concerns attendant to the Juvenile Act authorizing a probation officer to place a juvenile in a shelter on their own initiative, M.C.K. does not develop an argument that the statute is unconstitutional. His arguments essentially claim that the juvenile court abused its discretion in continuing the shelter placement. **See** M.C.K.'s Brief at 13 (arguing that M.C.K. attended school with E.S. for months following the allegations and before the petition; M.C.K. had no disciplinary issues at school; M.C.K. remained at home after the alleged incidents and was not accused of committing any other acts and was therefore not a danger to anyone). These claims are all specific to whether his placement was justified and does not implicate any broader question of public importance. **Cf. Interest of N.E.M.,** 311 A.2d at 1095 (where a juvenile, who had been released, sought review of his post-dispositional placement outside of the home pursuant to Pa.R.A.P. 1612, deeming the issue "one of important public interest, as it asks whether juveniles have a right to expedited review of placements that take them out

of their homes and into institutions"). We therefore decline to review the issue.

### Discovery violations

M.C.K.'s second claim alleges that the Commonwealth violated its discovery obligations by withholding two items: the Pennsylvania Detention Risk Assessment Instrument ("PaDRAI") and a youth service assessment ("YSA"). M.C.K.'s Brief at 14-17. M.C.K. obtained the YSA following the disposition hearing but not the PaDRAI.

The PaDRAI was cited during one of the shelter review hearings, when Brenda Beers, the deputy chief of the Probation Department, testified in place of M.C.K.'s assigned probation officer, Mark Saporito. N.T., 11/14/2023, at 5. She testified that her department's recommendation was to continue M.C.K.'s shelter placement. *Id.* at 6. On cross-examination, M.C.K.'s counsel asked if she or her department had considered alternative placements. *Id.* at 17. Beers stated, "I would say we determined that going home was not [a]n option and the other option would be shelter care, and according to the [PaDRAI], the instrument that we use to determine whether or not detention is appropriate, it was an automatic detention." *Id.*[5] However, detention beds were not available, and, in any event, considering M.C.K.'s age the

---

[5] This transcript is included in the reproduced record, but not the certified record. The parties do not dispute that the included transcript is an accurate representation of the hearing. *See Commonwealth v. Brown*, 52 A.3d 1139, 1145 n.4 (Pa. 2012).

department "felt shelter care was appropriate." *Id.* M.C.K. did not ask any questions about the PaDRAI or otherwise request its disclosure.

As to the YSA, that document was mentioned at the disposition hearing during Officer Saporito's testimony. He informed the court that the YSA yielded an "overall score [of four] which places him in the low risk need category. He was overridden at a high risk level due to the serious nature of the offenses." *Id.* This "override" apparently meant that notwithstanding the "low risk" result from the YSA, Officer Saporito disagreed based upon the offenses he committed.

M.C.K. obtained the YSA after the disposition hearing following a motion he filed on March 22, 2024, requesting sanctions against the Commonwealth and an order to produce a copy of the YSA. The motion stated that a subpoena was served on the Probation Department directing it to provide, inter alia, the YSA. That office did not produce the YSA, and apparently informed M.C.K. that it would not. The juvenile court held a hearing and denied the motion for sanctions. However, the court ordered the Probation Department to provide M.C.K. a copy of the YSA.

M.C.K. argues that the Commonwealth was required to supply both items pursuant to his discovery request, filed on November 8, 2023, which requested "any evidence favorable to the accused which is material to guilt or to punishment," including "medical records, results or reports of scientific tests, expert opinions, and written or recorded reports of … physical or mental examinations of the defendant[.]" Motion for Discovery, 11/8/2024, at

unnumbered 1. The quoted materials are within the mandatory disclosure provisions. *See* Pa.R.J.C.P. 340(B)(1), (4). Following our review of the record and relevant law, we deem both contentions waived.

Beginning with the PaDRAI, the only mention of that document was during Beers' testimony, where she indicated the PaDRAI is a tool used to determine whether a juvenile should be detained. In context, her testimony indicates that the PaDRAI recommends a disposition based on a variety of factors. Given its purpose, the PaDRAI does not qualify as discoverable under Pa.R.J.C.P. 340(B)(1), which requires disclosure of "evidence favorable to the juvenile that is material either to adjudication or to disposition, and is within the possession or control of the attorney for the Commonwealth." The only other discernible basis for disclosure cited by M.C.K. is pursuant to Rule 340(B)(4), which applies to "any results or reports of scientific tests, expert opinions, and written or recorded reports of polygraph examinations or other physical or mental examinations of the juvenile that are within the possession or control of the attorney for the Commonwealth[.]" Pa.R.J.C.P. 340(B)(4). It may be that the PaDRAI informed Beers' opinion, but that document is not itself a "result or report" of anything.

Rule 340 further instructs the parties to "make a good faith effort" to resolve discovery disputes before filing "an appropriate motion to the court." Pa.R.J.C.P. 340(A). Thus, in this regard, reviewing M.C.K.'s claim that the PaDRAI would have been helpful is impossible on the current record because the "PaDRAI has not been provided" to him. M.C.K.'s Brief at 16. This is

because he failed to request the PaDRAI at any time, even though he knew of its existence before the adjudication hearing. He also failed to make any effort to resolve the dispute, nor did he file a motion to compel the Commonwealth to produce the PaDRAI, as the subpoena and motion to compel filed referenced only the YSA. To the extent this could be viewed as a discovery violation, the Rules of Juvenile Court Procedure grant the juvenile court initial discretion to determine the applicable remedy, Pa.R.J.C.P. 340(E); M.C.K.'s aforementioned failures to seek the material prevented the court from doing so. For all these reasons, any claim regarding the PaDRAI is waived.

Turning to the YSA, we deem the claim waived for similar reasons. Unlike the PaDRAI, M.C.K. did obtain the YSA. However, despite possessing the document, M.C.K. fails to discuss what it says and how the failure to disclose it sooner prejudiced him. "To succeed on a **Brady** [**v. Maryland**, 373 U.S. 83 (1963)] claim, the defendant must show: (1) evidence was suppressed by the prosecution; (2) the evidence, whether exculpatory or impeaching, was favorable to the defendant; and (3) prejudice resulted." **Commonwealth v. Cousar**, 154 A.3d 287, 301 (Pa. 2017) (citations omitted).[6] Accepting, arguendo, that the Commonwealth suppressed this item, M.C.K. fails to argue how the evidence was favorable to him or that he

---

[6] The Pennsylvania Rules of Criminal Procedure disclosure provision "imposes greater obligations upon prosecutors than the **Brady** requirements. Nevertheless, our cases frequently analyze whether a particular discovery sanction was justified by analyzing whether the evidence was required to be disclosed pursuant to **Brady**." **Commonwealth v. Brown**, 200 A.3d 986, 994 (Pa. Super. 2018) (citation omitted). We apply the same analysis here.

was prejudiced by its omission. He baldly asserts that the "YLS was *clearly* favorable to M.C.K. and *clearly* material to disposition." M.C.K.'s Brief at 16 (emphases in original). He simply claims, with no elaboration or legal development, that he is entitled to discharge:

> The Commonwealth's disregard of its statutory and constitutional discovery obligations was designed to, and did, unfairly inhibit M.C.K.'s ability to defend against the allegations of criminal conduct and/or to advocate for an appropriate disposition. In withholding mandatory discovery materials from the defense, the Commonwealth violated the Rules of Juvenile Court Procedure and M.C.K.'s right to due process. Therefore, M.C.K. respectfully requests that this Honorable Court vacate the adjudication of delinquency/disposition, and that he be discharged.

M.C.K.'s Brief at 17.

It is not clear why the remedy would be discharge. In any event, because of M.C.K.'s failure to explain what the YSA says, how it is beneficial to him, and how its absence prejudiced him, his claim is waived.

## Authentication of evidence

In his third claim, M.C.K. argues that the juvenile court abused its discretion in allowing the Commonwealth to present digital messages sent by E.S. to M.C.K.'s mother ("Mother"). M.C.K.'s Brief at 17-20. These messages were introduced during the testimony of E.S., when the Commonwealth introduced screenshots of messages E.S. sent to Mother through Facebook's messaging function. "An appellate court's standard of review of a trial court's evidentiary rulings … is [for an] abuse of discretion. *In re N.C.*, 105 A.3d 1199, 1210 (Pa 2014).

The presentation and evidentiary rulings on these messages were both confusing. When the Commonwealth asked to present the exhibit to E.S., M.C.K. objected on the basis that the Commonwealth failed to lay a foundation "that this communication involves [Mother]." N.T., 11/21/2023, at 51. The Commonwealth elicited evidence from E.S. that she had communicated with Mother in the past and E.S. indicated that the timeframe for the messages in question was approximately one month after she and M.C.K. ended their relationship. *Id.* at 51-52. The Commonwealth again moved to introduce the exhibit, and M.C.K. maintained that the exhibit was still not properly authenticated. *Id.* at 53. The juvenile court overruled that objection. *Id.* The Commonwealth then asked E.S. to discuss a specific exchange. M.C.K objected, arguing:

> Your Honor, I'll object in that I guess if these are part of a text message chain or there's an electronic record of these messages, that the best evidence rule requires those messages to be here. Obviously these ones are here and now the Commonwealth is asking the witness about messages that apparently immediately preceded these ones and they're not here.

*Id.* at 53-54.

Briefly, the "best evidence" rule addresses the circumstances in which the proponent of a writing like these messages must introduce the originals. *See* Pa.R.E. 1002 ("An original writing ... is required in order to prove its content unless these rules, other rules prescribed by the Supreme Court, or a statute provides otherwise."); ***Commonwealth v. Green***, 162 A.3d 509, 517 (Pa. Super. 2017) (citing Rule 1002 as codifying "the common law 'best

- 12 -

evidence rule'"). The common law rule "dated back to the time when copies were made by hand copying and were therefore subject to inaccuracy," ***Commonwealth v. Talley***, 265 A.3d 485, 535 (Pa. 2021) (citation omitted), and in criminal cases its application is generally required only if the contents of the item are necessary to prove the elements of an offense. ***Id.*** at 533 (concluding that the best evidence rule applied to text messages in prosecution for stalking and terroristic threats charges as the contents "were closely related to a controlling issue").

The writings here were not necessary to prove any element of any of the charged offenses and the best evidence rule therefore does not apply. In any event, M.C.K.'s substantive argument before this Court indicates that he was not raising a best evidence challenge. There was no assertion or even a concern that E.S. fabricated the screenshots; the authentication argument was that the Commonwealth could not prove that Mother herself sent the messages at issue. M.C.K.'s argument was that the exhibits were selective, as "the Commonwealth is asking the witness about messages that apparently immediately preceded these ones and they're not here." N.T., 11/21/2023, at 54.

This argument implicates the "rule of completeness." ***See*** Pa.R.E. 106 ("If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part – or any other writing or recorded statement – that in fairness ought to be

considered at the same time."). The juvenile court likewise viewed M.C.K.'s "best evidence" objection as a rule of completeness assertion, as the court stated on the record: "Okay. [Commonwealth], the messages do seem to pick up in the middle of a conversation. Do you have all of this purported conversation?" N.T., 11/21/2023, at 54. The Commonwealth replied, "I don't have any further documentation of this conversation in particular," and asked permission to have E.S. discuss if she recalled what communications preceded the ones shown in the exhibit. *Id.* The juvenile court replied, "All right. You can do that with some limitations. First of all, what [Mother] may have said to the juvenile is hearsay, so she can't testify about that. What she said to [Mother] she could say." *Id.* at 54. The juvenile court then imposed the additional limitation that "if the testimony is going to be in an earlier text message they talked about this, then I'm sustaining the best evidence [sic] objection."[7] *Id.* at 55.

Additionally, the juvenile court questioned Mother about her communications with E.S. Mother testified that M.C.K.'s bedroom did not have a door, *id.* at 149, and she initially allowed M.C.K. and E.S. to stay in the bedroom unsupervised. *Id.* at 150. However, in late December of 2022 or early January 2023, both families "found out that they had had sex and we

_____

[7] Again, since this ruling references messages preceding the specific conversations depicted in the exhibit, it appears that the juvenile court misspoke and instead intended to reference the rule of completeness.

- 14 -

just decided after that they weren't allowed to be alone together." *Id.* Thus, from that point on, she or some other family member monitored their interactions and could see in the bedroom either directly or indirectly from a mirror in the home. *Id.* at 151. She testified that she never heard or suspected any inappropriate behavior or violent acts. *Id.* at 155. M.C.K. additionally elicited that E.S. and Mother interacted directly on many occasions, and E.S. "confided in" Mother. *Id.* at 156. Mother agreed that E.S. "describe[d] herself as obsessed" with M.C.K. *Id.* Following the Commonwealth's cross-examination, the juvenile court asked questions, including about the Commonwealth's exhibit. The court read the following text from Mother to E.S.:

> I'm sorry for his behaviors. This will not be happening again because he will be losing everything in his room his phone and all of his privileges. I'm glad u told me so I can handle it. Can we keep it between us tho I don't need him getting in anymore trouble then what he is already in."

*Id.* at 166-67. The court asked, "What were the behaviors that you were apologizing for?" Mother stated, "[E.S.] said he was aggressive. ... I apologized because he is my child, if he was being aggressive." *Id.* at 167. The court then asked, "What exactly did [E.S.] say to you about [M.C.K.] being aggressive?" *Id.* M.C.K. interjected, saying, "Your Honor ... you sustained a best evidence [sic] objection to the preceding parts of that exhibit that were not entered by the Commonwealth." *Id.* The court responded, "Yeah, yeah. I'm going to follow up with a few questions." *Id.* The court then asked,

- 15 -

among other topics, why Mother asked E.S. to "keep it quiet" that M.C.K. was being aggressive. *Id.* at 168. Mother replied, "[S]he put on Snapchat pictures of the supposable [sic] rape, and I meant between her and I, I didn't want it on Snapchat, it wasn't the world's business, and ... I was still in contact with her parents and wanted to discuss this with them and the children together." *Id.* at 168.

M.C.K. now claims that the juvenile court erred because his original authentication claim should have been sustained, and that the court compounded its error by sua sponte asking Mother about her conversations with E.S. M.C.K.'s Brief at 19-20.

In its opinion, the juvenile court opines that the messages were properly authenticated. Juvenile Court Opinion, 5/8/2024, at 20. Next, the court explains it "questioned [Mother] for clarification" because "the victim testified that the first person she spoke to about the sexual assaults was [Mother]." *Id.* at 21. As to the court disregarding its earlier ruling "that [the messages] constituted hearsay," *id.*, the court responds that it "rule[d] that the victim could not testify regarding the messages from [Mother]." *Id.*[8] Alternatively,

_____

[8] This characterization of the record is confusing. The sua sponte hearsay ruling during E.S.'s testimony was limited to what "[Mother] may have said to the juvenile[.]" N.T., 11/21/2024, at 54. While the reference to "juvenile" was ambiguous, our review of the record reveals that in context, the "juvenile" was M.C.K. Thus, the juvenile court was prohibiting E.S. from relaying what Mother said to M.C.K. as relayed to E.S. by Mother. The ruling could not have been that E.S. could not testify to what Mother said to her, as that would bar
*(Footnote Continued Next Page)*

the court notes that "any error … was cured when [Mother] took the stand and testified to the same messages[.]" *Id.*

We agree that any error in the introduction of the messages was harmless beyond a reasonable doubt as Mother admitted that she sent the messages. *In re F.P.*, 878 A.2d 91, 95 (Pa. Super. 2005) (applying harmless error doctrine to claim that internet messages were insufficiently authenticated). To the extent that M.C.K. argues that we cannot rely on this admission because the juvenile court sua sponte examined Mother, we conclude any argument regarding the juvenile court's questioning is waived. While M.C.K. objected, he did so only on the grounds that the juvenile court was contradicting its earlier "best evidence" ruling.[9] He did not object on the basis that the juvenile court should not have cross-examined Mother.

### Rape Shield law

M.C.K. next argues that the juvenile court committed reversible error by invoking the Rape Shield Law, 18 Pa.C.S. § 3104, to limit cross-examination about E.S. previously having a boyfriend. M.C.K.'s Brief at 21-

---

all testimony about these conversations. We note that M.C.K. did not raise any hearsay objection to these communications.

[9] We note that M.C.K. not only called Mother as his own witness, he questioned her about the content of communications between Mother and E.S. N.T., 11/21/2023, at 156 ("During your communications with [E.S.], did she ever describe herself as obsessed or obsessive … with [M.C.K.]?"). M.C.K. cannot now limit his authentication challenge to the subset of messages harmful to his position.

- 17 -

22. Although we agree that the court erred, we conclude that the error was harmless beyond a reasonable doubt.

The record reflects that on cross-examination, M.C.K. asked E.S. how the two met, and she stated that M.C.K. requested to become her friend through Snapchat. N.T., 11/21/2023, at 62. M.C.K. followed up by asking, "Why did you accept the request[?]" and E.S. responded, "Because at that point I was adding a bunch of people back because I was going through a breakup." *Id.* M.C.K. then rejoined, "So when you told the Children's Advocacy Center in your interview that [M.C.K.] was your first actual boyfriend, that wasn't true; was it?" *Id.* The juvenile court sua sponte curtailed this line of impeachment on the grounds that the "Rape Shield Law ... precludes evidence about a complainant's prior relationships of any kind." *Id.*

As M.C.K. correctly states, the Rape Shield law applies to sexual relationships:

> Evidence of specific instances of the alleged victim's past sexual conduct, past sexual victimization, allegations of past sexual victimization, opinion evidence of the alleged victim's past sexual conduct, and reputation evidence of the alleged victim's past sexual conduct shall not be admissible in prosecutions of any offense listed in subsection (c) except evidence of the alleged victim's past sexual conduct with the defendant where consent of the alleged victim is at issue and such evidence is otherwise admissible pursuant to the rules of evidence.

18 Pa.C.S. § 3104(a). The statute "is intended to exclude irrelevant and abusive inquiries regarding prior sexual conduct of sexual assault

complainants." ***Commonwealth v. Burns***, 988 A.2d 684, 689 (Pa. Super. 2009) (en banc).

The purpose of the question was to establish E.S. was not credible because her prior statement was inconsistent with her testimony. On its face, the question has nothing to do with past sexual conduct and, as such, the Rape Shield law does not apply. The juvenile court thus erred in its substantive ruling.

However, claims that the juvenile court erroneously limited cross-examination are subject to harmless error review. ***See Commonwealth v. Dowling***, 778 A.2d 683, 687 (Pa. Super. 2001). An error is harmless if, inter alia, the juvenile court, sitting as factfinder, expressly states that the error did not impact its determination (i.e., it could not have contributed to the verdict). ***See Commonwealth v. Bullock***, 286 A.3d 1282, 1288 (Pa. Super. 2022). Here, M.C.K. is not entitled to relief because the juvenile court also expressly found that the excluded testimony was cumulative of other instances of inconsistencies between her trial testimony and statements she made at the forensic interview. ***See*** Juvenile Court Opinion, 5/8/2024, at 22 ("If it is asserted that the questioning was proper impeachment, as the victim may have indicated in her … interview that [M.C.K.] was her first boyfriend, it is this [c]ourt's opinion that the testimony was cumulative of the other testimony elicited ... regarding purported inconsistencies in the victim's interview … and the testimony during the hearing."). The juvenile court found E.S. to be

credible despite these inconsistencies. It is the role of the juvenile court, as factfinder, to resolve questions of credibility of witnesses, and this Court may not disturb these credibility determinations unless they have no support in the record. **Commonwealth v. Keaton**, 82 A.3d 419, 425 (Pa. 2013) (citation omitted); **see also Commonwealth v. Askins**, 761 A.2d 601, 603 (Pa. Super. 2000) ("[W]here the court has heard the case *de novo,* is limited to whether the trial court committed an error of law and whether the findings of the trial court are supported by competent evidence"). As the juvenile court deemed E.S. credible notwithstanding the discrepancy, the error in excluding the testimony that E.S. previously had a boyfriend was harmless beyond a reasonable doubt.

**Credibility assessments**

In M.C.K.'s fifth claim he asserts that the juvenile court was biased in favor of sexual assault victims. M.C.K.'s Brief at 23-26. He contends that "[t]he following facts weigh against the credibility of the purported victim," citing four facts which, in M.C.K.'s view, establish that E.S. was not credible: (1) E.S. did not tell anyone about the rapes until after she and M.C.K. stopped dating; (2) she repeatedly returned to M.C.K.'s residence after the rapes began; (3) she continued to contact M.C.K. even after disclosing the rapes; and (4) she attempted to interfere with M.C.K.'s relationship with another girl. **Id.** at 23-24. He also points to three "demonstrable lies," which are conflicts

between her testimony and prior statements to the forensic interviewer. *Id.* at 25.

M.C.K. argues that the juvenile court erred by finding E.S. credible "[d]espite the objective, almost-palpable incredibility of the purported victim[.]" *Id.* at 25. He claims that the court's decision "is, perhaps, better understood" by examining the following comments by the juvenile court:

> By way of general comment, as an attorney, as solicitor for Children & Youth services, as somebody who did pro bono work for The Safe Place and as a judge for the last 14 years of my career, sexual assault does not make sense. Reaction to sexual assault does not make sense. All the experts I've ever heard is from the witness stand regarding how victims react, what they do during, after is counterintuitive. Victims uniformly don't make an immediate report. They don't. There's a number of reasons for that. Victims will sometimes stay with their perpetrator. Counterintuitive, it happens. I'm talking about adults, juveniles. From the outside it doesn't make sense.

*Id.* (quoting N.T., 11/21/2023, at 286).

M.C.K. then defines the term "bias" and argues that because of the judge's background, he "was clearly prepared to excuse the incredibility of the purported victim before the proceeding even commenced." *Id.* at 26. Thus, M.C.K. argues that the juvenile court's "failure to properly weigh the credibility of the purported victim in this matter was the result of bias, prejudice, and/or partiality[.]" *Id.*

The court's failure to rule in favor of M.C.K. does not establish that the court failed to assess E.S.'s credibility or was biased in her favor. M.C.K. is simply asking this Court to reweigh the credibility of E.S., which we cannot

do. *Commonwealth v. Cramer*, 195 A.3d 594, 601 (Pa. Super. 2018) ("Appellant essentially asks us to reassess the credibility of the Victim and reweigh the evidence presented at trial. We cannot do so."). Furthermore, the juvenile court cogently explained the comments it made and the context in which it made them:

> The [c]ourt would like to specifically address assertions made in the concise statement filed by [M.C.K.] that the [c]ourt made statements when rendering its opinion and determination, that implied "all purported victims are always credible regardless of evidence to the contrary." This [c]ourt stated nothing of the kind. The [c]ourt stated that it believed the testimony of the victim in this case and gave the detailed reasons why. Any general comments regarding victims of sexual assaults, and their behavior during and after the assaults, were intended to address closing comments made by [M.C.K.]'s counsel such as "her behavior afterwards was not consistent with the behavior that you would expect of a victim of sexual assault" and "that's not behavior that is consistent ... with someone who has been victimized in a sexually violent manner...". The [c]ourt's comments were intended to convey why the [c]ourt, as fact finder, believed the testimony of the victim despite the purported credibility issues raised by [M.C.K.].

Juvenile Court Opinion, 5/8/2024, at 9.

M.C.K. alleges that the juvenile court erred by relying on these considerations because "no psychiatric expert – pediatric or otherwise – testified to *this* purported victim's state of mind." M.C.K.'s Brief at 26 (emphasis in original). We take no issue with the juvenile court discussing these concepts. As our Supreme Court acknowledges, "[w]hile some laypersons may be aware of common behaviors and responses to sexual abuse, it would be a generalization to assume that the average juror is privy

to the complex psychological dynamics surrounding sexual abuse." *Commonwealth v. Jones*, 240 A.3d 881, 891 (Pa. 2020). The *Jones* decision authorized courts to admit expert evidence regarding victim responses and behaviors on a case-by-case basis. The juvenile court's statements are simply an acknowledgement that the court is aware of the "complex psychological dynamics surrounding sexual abuse." *See id.* at 891. Thus, M.C.K.'s claim in this regard is without merit.

### Sufficiency of evidence – lack of consent

The sixth issue presented avers that the evidence was insufficient to support a finding that he committed the acts of delinquency for which he was adjudicated. M.C.K.'s Brief at 27-30. Our standard of review is well established:

> When a juvenile is charged with an act that would constitute a crime if committed by an adult, the Commonwealth must establish the elements of the crime by proof beyond a reasonable doubt. When considering a challenge to the sufficiency of the evidence following an adjudication of delinquency, we must review the entire record and view the evidence in the light most favorable to the Commonwealth.

*In Int. of J.G.*, 145 A.3d 1179, 1188 (Pa. Super. 2016) (citation omitted). The juvenile court is "free to believe some, all, or none of the evidence presented." *Id.* (citation omitted).

M.C.K. does not specifically address the elements of any the offenses; instead, he argues that E.S. consented to the sexual conduct. *Id.* at 28. M.C.K. maintains that E.S.'s "repeated, voluntary acts of returning to the

home of M.C.K. and moving to his bedroom immediately upon arrival ... strongly suggests that the parties' sexual contact was consensual." *Id.* In support, M.C.K. cites a message sent from E.S. to M.C.K., wherein E.S. stated:

> Sometimes when I say no to things or tell you not to do something like to me or for me it's only because I actually want you to do it or but I want you to push and do it anyway maybe without telling me. It makes me happy. But you've never done it and it makes me a little upset cuz a lot of the time I really want u to do it.

*Id.* at 29 (quoting N.T., 11/21/2023, at 72).

What M.C.K. fails to mention is that E.S. testified that this message had nothing to do with their consensual non-consent sex. "[T]his text is not – it's about buying me flowers and getting me gifts." N.T., 11/21/2023, at 74. M.C.K. does not point to anything in the record definitively showing that the text message was about the instances of anal intercourse at issue here.

Moreover, the record reflects that E.S. specifically testified that she did not consent to the sexual acts in question, told M.C.K. "no," and repeated the safe word on each occasion, which M.C.K. ignored. "[T]he uncorroborated testimony of the complaining witness is sufficient to convict a defendant of sexual offenses." *Cramer*, 195 A.3d at 602. The evidence was therefore sufficient to find that M.C.K. committed the acts for which he was adjudicated delinquent.

**Mistake of fact defense**

M.C.K.'s seventh issue claims that the juvenile court erred by not crediting his "defense" that he reasonably but mistakenly believed that E.S. consented to anal sex. *See* M.C.K.'s Brief at 30. M.C.K. recognizes the

binding case law rejecting a mistake of fact defense for sexual assault cases. *See Commonwealth v. Williams*, 439 A.2d 765, 769 (Pa. Super. 1982); *Commonwealth v. Fischer*, 721 A.2d 1111, 1118 (Pa. Super. 1998) (applying *Williams*). He nonetheless suggests that these cases can be distinguished "under circumstances like those present here," presumably referring to consensual non-consent sex. M.C.K.'s Brief at 32.

To the extent that this "consensual non-consent sex" fact pattern serves as a valid basis to distinguish the foregoing case law, we decline to do so as he waived any such claim. Pointedly, M.C.K. does not cite to any place in the record where he raised this argument to the juvenile court during the proceedings. *See* Pa.R.A.P. 302(a). To the contrary, M.C.K. argued before the juvenile court that the alleged sexual contact did not occur, as it ended after E.S.'s parents found a condom, at which point M.C.K.'s family began monitoring their visits.

> She told you, Your Honor, that -- she told you that it was only after that December/January incident with the condom that anything unconsensual occurred. That was the -- that was the breaking point. It's after that that anything allegedly unconsensual occurred, and there's no evidence, no suggestion even, Your Honor, that anything unconsensual happened before that point.
>
> Your Honor heard the testimony of the parents and grandparents and the alleged victim herself described that somebody from that point forward was always around, there was always an adult present, whether it was at her house or her being her parents I suppose or at [M.C.K.'s] residence.
>
> [M.C.K.]'s bedroom doesn't have a door on it, Judge. You can see into the bedroom from the kitchen which is seven feet away. You can see into the room from the living room where she's

maybe 10, 15 feet away. You can see into the bedroom from other bedrooms in the house. And again, there's always somebody there. Nobody witnessed any of this. Nobody heard anything suggestive of impropriety, sexual or otherwise, or illegal activity.

N.T., 11/21/2023, at 221.

It was M.C.K.'s position that E.S. did not credibly testify about the sex acts occurring in M.C.K.'s bedroom. This aligns with the theory of the case M.C.K. presented before the trial court, as the majority of the witnesses he called to testify were adults with supervisory responsibilities in his home, all of whom stated that E.S. and M.C.K. were never alone in the home and that no sexual activity between them occurred there after the discovery of the condom. *See id.* at 148-266. The argument that M.C.K. mistakenly believed that E.S. consented to anal intercourse requires a concession that those sex acts occurred. Moreover, as M.C.K. did not testify, there is no record support for the juvenile court to conclude that he subjectively believed that E.S. consented to anal intercourse. This claim has therefore been waived for failing to pursue it at the juvenile court level.

## Sufficiency of evidence - forcible compulsion

M.C.K.'s eighth and final claim is that the Commonwealth failed to establish that he forcibly compelled E.S. to engage in anal sex, and thus should not have been adjudicated delinquent for the offenses of rape by forcible compulsion, involuntary deviate sexual intercourse by forcible compulsion, aggravated indecent assault by forcible compulsion, and indecent

assault by forcible compulsion, all of which contain the element of "forcible compulsion." Forcible compulsion is defined as "[c]ompulsion by use of physical, intellectual, moral, emotional or psychological force, either express or implied." 18 Pa.C.S. § 3101. M.C.K. cites *Commonwealth v. Berkowitz*, 641 A.2d 1161 (Pa. 1994), wherein the Supreme Court found that the evidence was insufficient to establish the actor used force. He argues that the facts are similar and compels the same result in the case at bar. M.C.K.'s Brief at 35.

In *Berkowitz*, the victim and Berkowitz were both college students and the victim voluntarily entered the defendant's dorm room while looking for a friend. *Berkowitz,* 641 A.2d at 1163. She stayed after realizing the friend was not there and started conversing with Berkowitz; at some point, Berkowitz lifted her bra and shirt and began undoing her pants. *Id.* The victim rejected his attempt to put his penis in her mouth, following which Berkowitz locked the door. Berkowitz then "put [her] down on the bed." *Id.* at 1164. She described that physical act as "kind of like a push but not[.]" *Id.* The Court determined that this was insufficient to establish physical compulsion. *Id.* at 1165.[10]

---

[10] At the time of the *Berkowitz* decision, section 3101 did not define forcible compulsion. "Although the rape and IDSI laws have always required the element of 'forcible compulsion,' that term was not initially defined." *Commonwealth v. Fischer*, 721 A.2d 1111, 1115 (Pa. Super. 1998). Thus, the *Berkowitz* Court did not address the fact that Berkowitz locked the door as a potential basis for finding forcible compulsion. The General Assembly responded to *Berkowitz* by amending section 3101 to add a definition that went beyond physical force.

We disagree that **Berkowitz** is controlling here. Unlike in **Berkowitz**, which involved only a "slight push" onto the bed and then the defendant's body weight on the victim, E.S. here testified that M.C.K. would apply force to her body when she attempted to get up from the bed during the assaults. N.T., 11/21/2023, at 42. E.S. stated that the force applied by M.C.K. would place one hand on her shoulder, applying enough force to prevent her from moving. **Id.** at 43 ("Q. Was he pushing and holding hard enough that you could not get away? A. Yes."). This is sufficient to establish forcible compulsion. **See Commonwealth v. Farmer**, 758 A.2d 173, 181 (Pa. Super. 2000) (distinguishing **Berkowitz**; Farmer "pushed [the victim] to his car when she tried to push him away" and "held her shoulders down with both hands while he had sexual intercourse with her"). Therefore, M.C.K.'s final claim is without merit.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

2/10/2025